IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| In re: ) | Involuntary Petition |
| ) | Under Chapter 11 |
| **DICON TECHNOLOGIES, LLC,** ) | |
| ) | Case No. 10-41275 LWD |
| **Alleged Debtor.** ) | |
| ) | |

**EMERGENCY MOTION OF PETITIONING CREDITORS FOR ORDER
APPOINTING CHAPTER 11 TRUSTEE**

The Development Authority of Bryan County, Precision Custom Coatings, LLC and Interfoam, Inc. (the "Petitioning Creditors"), by their undersigned counsel, hereby move pursuant to section 1104(a) of the Bankruptcy Code for an Order appointing a Chapter 11 Trustee for the Debtor on an emergent basis, and in support thereof say as follows:

PRELIMINARY STATEMENT

In 2008, Dicon Technologies, LLC ("Dicon"), a consumer and medical products technology company once indirectly owned by Berkshire Hathaway, relocated its corporate offices and U.S. manufacturing operations to a new facility in the Interstate Center in Bryan County, and looked forward to a promising future as a member of the coastal Georgia business community.

Unfortunately, less than a year later, Dicon was acquired by a "penny stock" public company, Spongetech Delivery Systems, Inc. ("Spongetech"), whose financial statements were almost entirely based on fabricated sales to fictitious customers. Over the past several months, investigations have revealed the sweeping extent of Spongetech's

fraud, culminating in the recent filing of civil and criminal securities fraud charges by the SEC against Spongetech and its principals.

As Spongetech melted down, those same principals reacted by siphoning hundreds of thousands of dollars in cash from Dicon, making it impossible for Dicon to meet its obligations to its creditors and jeopardizing Dicon's ability to continue to operate and retain its customers, thus precipitating the instant bankruptcy filing.

Dicon is in a severe crisis and needs strong management and access to capital to survive. Unfortunately, the storm surrounding the parent company has left Dicon a rudderless and foundering ship. Unless Dicon can be extricated from control of Spongetech and its principals, it will be dragged down by its tainted parent. As a result, the creditors of Dicon have commenced this case to preserve the going concern value of Dicon and enable Dicon to survive and succeed, either via a sale or as a recapitalized stand-alone company.

## BACKGROUND

History of Dicon

1. Dicon is principally engaged in the business of developing, manufacturing and marketing a wide variety of products based on its hydrophilic urethane foam technology. Hydrophilic urethane foam is significantly different from conventional foam, where less than 1 percent of the formulation is water. Hydrophilic urethane foam comprises a prepolymer phase with a high concentration of water to form a plastic membrane that wicks and absorbs up to 160 times its weight. This property can be used to create a highly absorbent urethane foam, or to incorporate a wide variety of water

soluble ingredients into the product which become an integral part of the water based membrane and can be released over time by heat or pressure.

    2.     Applications of this hydrophilic urethane foam technology include:

         a.     Purecell®, a patented latex free hydrophilic foam which applies makeup flawlessly without streaking, is compatible with all makeup formulations, is available with a Vitamin E additive, and is available in a wide variety of sizes and shapes.

         b.     Dicon hydrophilic foam technology is suited for use as medical bandages, medical wraps, and as liner for casts and braces. The foam is soft, flexible, and absorbent to almost any liquid and is safe for contact with skin or wounds.

         c.     Home, car and pet care products that can be impregnated with soap, shampoo, fragrance or flea repellent.

         d.     Odor absorbent and cushioned foot care products such as replacement insoles, sold by Brown under the Dryz® brand.

         e.     Soil additives for agricultural use with timed-release nutrients..

    3.     Prior to December 2007, Dicon operated as a division of the H.H. Brown Shoe Company ("Brown"), which in turn is a subsidiary of Berkshire Hathaway, Inc. In late 2007, Dicon was spun off by Brown and became a privately owned LLC with five equity owners. The principal intellectual property rights relating to the hydrophilic foam technology and the product lines developed therefrom continue to be owned by Brown and are licensed to Dicon.

4. Initially after the spinoff, Dicon was headquartered in New Jersey and outsourced essentially all its manufacturing overseas. In June 2008, Dicon, together with Development Authority of Bryan County ("Authority") officials and Governor Perdue, announced an agreement to construct a new manufacturing and administrative facility in the Interstate Center, at the intersection of Interstate 16 and US 280 in northern Bryan County.

5. Pursuant to such agreement, Dicon and the Authority entered into a 20 year lease dated August 1, 2008 (the "Lease"), wherein the Authority leased real property, a manufacturing facility, and equipment to Dicon. As part of the financing of the Dicon project, the Authority issued a revenue bond in the amount of $1,815,000. The Authority obtained a loan in the amount of $1,815,000, and Dicon guaranteed the payment of the loan. Dicon constructed the facility it presently occupies and commenced operations there on or about December 1, 2008. Upon information and belief Dicon employs approximately 30 people at the Bryan County site.

6. On or about July 9, 2009, the members of Dicon entered into an agreement to sell all the membership interests in Dicon to Spongetech for a cash payment of $2.35 million.

7. As a result of the above series of transactions, Dicon does not have an extensive history of independent operations. Based on the financial information available to Petitioning Creditors, in 2008, the only full year of independent operation, Dicon sustained a net loss of approximately $857,000 on sales of $6.9 million. It appears that Dicon's sales and profitability subsequently improved, such that Dicon would be

currently cash flow positive but for the actions of Spongetech which have seriously impaired Dicon's ability to maintain its customer relationships and operate profitably.[1]

Spongetech's Fraud

8. Spongetech was founded in 1999 as Romantic Scents, Inc. and through a series of mergers came to be known as Spongetech Delivery Systems, Inc. as of 2002.

9. From 2006 until the SEC suspended trading in October 2009, Spongetech's common stock was traded on the over the counter ("Pink Sheet") market under the symbol SPNG. However, a controlling block of Spongetech's shares is owned by one entity, RM Enterprises International, Inc., which in turn is owned and controlled by Michael Metter ("Metter"), Spongetech's President and CEO, and Steven Moskowitz ("Moskowitz"), Spongetech's CFO and COO.

10. According to Spongetech's SEC filings, in its early history Spongetech had only a modest amount of sales principally to one customer, Turtle Wax, which placed its last order in May, 2003. Following the cessation of sales to Turtle Wax, Spongetech reported little or no sales for several years -- $12,859 in its August, 2006 10-K, and $55,112 in 2007.

11. Beginning in 2007 and accelerating in 2008 and 2009, Spongetech, through Moskowitz and Metter, issued a series of press releases and SEC filings reporting rapidly increasing sales. They claimed millions of dollars in new orders for overseas shipment from five customers: SA Trading Company, US Asia Trading, Dubai Export Import Co., Fesco Sales Corp. and New Century Media. In their 10-Q report filed in

---

[1] Spongetech claims in documents filed in the SEC Civil Action that Dicon's sales for the 10 months ending April 30, 2010 were $6.3 million. While that figure is indicative of Dicon's potential, unfortunately it does not reflect current reality, because Dicon has been severely crippled by the actions of Spongetech and its principals which began before the events of May 5 (detailed herein) but intensified thereafter.

859738-01                                       5

April 2009, i.e. just before the Dicon acquisition, Spongetech claimed $31.4 million of sales in the nine months ended February 28, 2009, of which 99.4 percent were attributable to the aforementioned five customers together with Walgreens.

12. The problem with Spongetech's enthusiastic press releases and rosy SEC reports was that outside of $200,000 in sales to Walgreens, all of the other sales were apparently fabricated. According to the SEC, as set forth in the complaint ("SEC Complaint," attached hereto as Exhibit A) filed in its civil action against Spongetech, Metter, Moskowitz and others (the "SEC Civil Action"), SA Trading Company, US Asia Trading, Dubai Export Import Co., Fesco Sales Corp. and New Century Media were entirely fictitious companies.

13. In September 2009 (i.e., just two months after the Dicon acquisition), the SEC began investigating Spongetech and requesting documents to back up the reported sales. The SEC's investigation revealed that in an effort to create the illusion that the five fictitious customers were real, Spongetech engaged a third party to create websites for the companies and also rented "virtual offices" with telephone numbers answered by a receptionist. The websites were created using Internet domain names that were registered anonymously after the SEC subpoenaed records regarding the five customers. Spongetech then provided the SEC with fictitious names as contact persons for the five customers. The SEC also alleges that Spongetech supplied false and misleading purchase orders, invoices and bills of lading to substantiate the alleged orders by the fictitious customers. SEC Complaint at ¶¶ 53-68.

14. Spongetech also sought to create visibility and legitimacy to its name by entering into numerous promotion agreements with major league sports teams and

owners of sports arenas. As a result, Spongetech advertising briefly appeared in 2009 in major sports venues such as Yankee Stadium, Dodger Stadium and Madison Square Garden. Most or all of those agreements have since terminated, many in lawsuits by the sports teams or arena owners alleging Spongetech did not pay for the advertising. News reports have identified suits by the New York Islanders, Chicago Bears, New York Giants, Citi Field, Madison Square Garden and CBS Radio.

15. Press reports began appearing at about the same time as the SEC investigation began, questioning the validity of Spongetech's claimed sales and indicating that the existence of the five major customers could not be verified. See example attached as Exhibit B (SpongeTech Client Records Spring Leak, <u>New York Post</u>, September 25, 2009).

16. The SEC issued a formal notice of investigation to Spongetech on September 18, 2009. On December 24, 2009, the SEC issued a "Wells Notice" to Spongetech, Moskowitz and Metter, formally advising them that the SEC staff recommended that the SEC bring securities law violation actions against them and offering an opportunity for them to provide the SEC with facts or arguments in their defense.

17. Although Spongetech did not file a 10-K for the fiscal year ended May 31, 2009, it continued, even after the SEC investigation and other reports exposing its fraud were known, to claim inflated sales of over $50 million in fiscal 2009. This claim is still being made on a company website.[2] Spongetech also brazenly issued a press release on September 25, 2009 claiming that "The major customers cited in the SpongeTech's

---

[2] http://www.spongetechinc.com/company_profile/highlights, viewed 06/16/2010.

financial statements for the fiscal third quarter of 2009 are all current and active customers of the Company" and claiming that reports to the contrary were "Internet forgeries being used by short sellers and stock speculators to undermine the integrity of the Company and profit from the adverse publicity." Spongetech continued to retaliate against its critics by filing suit in April, 2010 against the New York Post, one of its reporters, and others, alleging that various news reports about the company were libelous. And as late as May 4, 2010, Moskowitz gave an interview to the New York Times downplaying the SEC investigation.[3]

18. On the next day, May 5, 2010, Spongetech's house of cards collapsed. On that date the SEC filed the SEC Complaint in the United States District Court for the Eastern District of New York, alleging that the conduct outlined above was part of a massive "pump and dump" scheme which also involved the preparation of forged attorney opinion letters, including some from a fictitious attorney. On the same date, the United States Attorney for the Eastern District of New York filed a criminal securities fraud complaint against Moskowitz, Metter and others (the "Criminal Complaint"). The Criminal Complaint, which is attached hereto as Exhibit C, sets forth additional detail regarding some of the allegations of the SEC Complaint. Metter and Moskowitz were arrested on May 5 and subsequently released on bond.

Moskowitz and Spongetech Siphon Cash from Dicon

19. After the 2009 acquisition, Dicon became a wholly owned subsidiary of Spongetech. As a limited liability company with one member, Spongetech, Dicon has no board of directors or officers who can exercise independent management authority over

---

[3] Penny Stock Finds Itself in a Corner, New York Times, May 5, 2010.

Dicon's affairs. The highest ranking local employees of Dicon are a plant manager and a controller who are not shareholders or directors.[4]

20. As a result, Spongetech, through Moskowitz and Metter, could exercise substantial control over Dicon's operations and finances. In particular, upon information and belief, Moskowitz, and possibly others, had (or claimed to have) authority to engage in transactions in Dicon's bank accounts.

21. Upon information and belief, Moskowitz and Spongetech have used this authority to siphon cash from Dicon. Over a period of several months in 2010, commencing before and continuing after issuance of the civil and criminal charges, upon information and belief, Moskowitz and Spongetech caused approximately $700,000 to be transferred from Dicon for the benefit of persons and entities affiliated with Moskowitz and Metter to whom Dicon owed no legitimate debts, including without limitation the following:

- Wire transfers and other transfers to Moskowitz/Metter affiliated entities Vanity Events, Leisure Time, America's Cleaning Company and RM Enterprises.

- ATM withdrawals using debit cards linked to Dicon accounts. Dicon employees sought to cancel the cards and Moskowitz induced the banks to reissue them.

- Over the counter cash withdrawals.

---

[4] The SEC Complaint and the Criminal Complaint do not allege any wrongdoing on the part of Dicon's employees. Indeed, the Criminal Complaint indicates that Dicon employees provided the FBI with information showing that Spongetech's purchases of product from Dicon could not support the sales levels Spongetech was claiming.

22. As a result of these transfers, Dicon was rendered insolvent within the meaning of section 303(h)(1) of the Bankruptcy Code. Dicon's payables (which are believed to aggregate approximately $1.2 million) are substantially delinquent, with many creditors more than 90 days delinquent.

23. Upon information and belief, Moskowitz and Spongetech either knew at the time they siphoned cash from Dicon that their actions would render Dicon insolvent, or acted in reckless disregard of the legitimate interests of Dicon's creditors. For example, the Petitioning Creditors understand that Moskowitz was told in May that Dicon needed to maintain at least $55,000 in its payroll account to be able to make its next payroll, and the next day he withdrew $9,000. The Petitioning Creditors also understand that as the cash crunch intensified, Spongetech would tell Dicon which bills it would or would not be allowed to pay.

Dicon's Extreme State of Crisis

24. As an immediate result of the liquidity crisis induced by Spongetech and Moskowitz, Dicon is in danger of being unable to maintain operations. Many suppliers have placed Dicon on a COD basis or have cut them off entirely, causing Dicon to be unable to source raw material and fill customer orders. As a result, Dicon is rapidly losing customers and falling into a death spiral. Without independent sound management and access to capital, Dicon will be unable to recover.

25. On May 13, 2010, the Authority issued a notice of default to Dicon under the Lease. Dicon's continuing failure to meet its obligations under the Lease place it in jeopardy of being dispossessed of its business premises and equipment.

26. On June 7, 2010, Dicon's major Chinese supplier filed suit against Spongetech and Dicon in the United States District Court for the Southern District of New York, claiming it is owed $358,000.

27. The SEC filed a motion in its civil action seeking to freeze the assets of the defendants. In response, and after meetings with the SEC on June 7, 2010, Metter has resigned from Spongetech, and Moskowitz and Metter gave up control of Dicon's bank accounts. However, at best that stops the bleeding after the damage has already been done, and does not restore any of the funds wrongfully diverted.

28. To the extent Moskowitz and Metter have agreed to step aside from running Spongetech, that development has unfortunately served to exacerbate the management vacuum for Dicon in time of crisis. Local Dicon personnel do not have, and have not been given, clear authority to make critical decisions for the company, and are in the untenable position of attempting to continue operations with no cash to pay employees and creditors and no plan that has been explained to them where the cash will come from.

29. Because Spongetech has never been what it said it was at the time it bought Dicon, it has not been able to support Dicon's growth in any way. Rather, it has been a drag on its subsidiary.

30. Dicon has the potential to exist independently of Spongetech. Most of its sales volume is not historically dependent on Spongetech. Its intellectual property is not owned by Spongetech. However, as long as Dicon remains umbilically tied to Spongetech, its future is at grave risk. Spongetech and its principals lack access to the

capital assets. The taint surrounding Spongetech is a significant deterrent to any potential investors and buyers.

31. The Petitioning Creditors believe that Dicon has substantial claims against Spongetech, Moskowitz, Metter and potentially others. However, as long as Dicon lacks sufficient independent management, it does not have the ability to pursue those claims.

The Petitioning Creditors

31. The Petitioning Creditors and their claims are as follows:

    a. The Authority is the lessor of Dicon's business premises under the Lease. Dicon currently owes the Authority $48,086.66 for Lease payments due on April, May and June, 2010, plus late fees. A payment of $16,000 is coming due for July. The Authority is not aware of and has not been advised of any dispute regarding its claim.

    b. Interfoam, Inc. ("Interfoam") is owed $31822.11 for labor in die cutting and packing two different products; individual facial cleaning pads and a cleaning pad called the "waffle" pad. Interfoam is not aware of and has not been advised of any dispute regarding its claim.

    c. Precision Custom Coatings, Inc. ("Precision") is owed $38,629.10 for goods manufactured, sold and delivered, consisting of a cleansing sponge is used as a facial sponge to remove make up, and a chemically bonded non-woven fabric that is treated with a silver lining paste binder, which is used as a shoe insole by Dicon. Precision is not aware of and has not been advised of any dispute regarding its claim.

32. Neither Interfoam nor Precision hold any security for their claims.

33. The Petitioning Creditors all face severe harm if Dicon goes out of business. Upon information and belief, a substantial portion of Dicon's receivables have

been factored, and Dicon's inventories are at best modest. Therefore, there are few assets to satisfy unsecured claims in a liquidation of Dicon.

RELIEF REQUESTED AND REASONS THEREFOR

**I. This Court Should Order the Appointment of a Chapter 11 Trustee**

    A. Cause Exists to Appoint a Trustee

Section 1104 of the Bankruptcy Code provides in pertinent part:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee--
  (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;
  (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

As a preliminary matter, this Court has authority to appoint a Chapter 11 trustee prior to the entry of an order for relief. As the court noted in *In re Professional Accountants Referral Service, Inc ("PARS").*, 142 B.R. 424 (Bankr.D.Colo. 1992), Section 1104(a) provides that the court may order the appointment of a trustee "at any time after the commencement of the case but before confirmation of a plan," thus not making entry of an order for relief a prerequisite for appointment. The *PARS* court found that appointment of an interim Chapter 11 trustee in the gap period was appropriate where the petitioning creditors had demonstrated a "reasonable likelihood or probability" that an order for relief would be entered, that cause existed under the appropriate

standards of Section 1104, and that "serious and irreparable injury" would occur "without the forthwith appointment of an independent, disinterested, competent trustee."

In this case, there is a high probability that an order for relief will be entered. The Petitioning Creditors anticipate that Dicon's own personnel will testify as to the company's inability to pay its debts as they came due, and to the lack of any bona fide dispute regarding the Petitioning Creditors' claims.

This case is replete with evidence of gross mismanagement and dishonesty of the type that has been found by many courts to support appointment of a trustee under Section 1104(a). The Debtor's managing member engaged in a massive and prolonged fraudulent scheme which came to an end only when Moskowitz and Metter were arrested last month. Incredibly, Moskowitz's and Spongetech's response to that event was not to be chastened, but rather to continue and arguably intensify their use of Dicon as a personal piggy bank, driving it to the brink of oblivion. A clearer case of dishonesty and gross mismanagement is difficult to imagine.

The diversion of funds itself constitutes sufficient cause. The *PARS* case involved financial statements that were "fabricated from whole cloth" and significant evidence of diversion of funds from the debtor to the personal benefit of the shareholders, and payment of bills that were not obligations of the debtor -- just as has occurred here. Similarly, in *In re PRS Ins. Group*, 274 B.R. 381 (Bankr.D.Del. 2001), the court held that a trustee should be appointed because the debtor could not explain transfers of funds to its parent company.

The pending civil and criminal securities fraud charges are also sufficient cause to appoint a trustee. *See In re Tradex Corp.*, 339 B.R. 823 (D.Mass. 2006) (debtor and

principal shareholder under grand jury fraud investigation); *In re American Resources, Ltd.*, 54 B.R. 245 (Bankr.D.Haw. 1985) (debtor's management facing civil and criminal fraud charges). The fact that the defendants have not yet been found guilty or liable is immaterial. As the court explained in *American Resources*, the evidence that multiple independent investigations reached similar conclusions (here, the SEC and the FBI) takes the matter out of the realm of naked allegations.

In *In re Intercat, Inc.*, 247 B.R. 911 (Bankr.S.D.Ga. 2000), this Court noted that the enumeration of fraud, dishonesty, incompetence, or gross mismanagement in section 1104(a) was not an exclusive definition of "cause," and identified several factors as relevant to determining whether a trustee should be appointed: "1) Materiality of the misconduct; 2) Evenhandedness or lack of same in dealings with insiders or affiliated entities vis-a-vis other creditors or customers; 3) The existence of pre-petition voidable preferences or fraudulent transfers; 4) Unwillingness or inability of management to pursue estate causes of action; 5) Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor; [and] (6) Self-dealing by management or waste or squandering of corporate assets." Each of these factors is present here. The misconduct is sweeping and its impact on the Debtor is material. The misconduct involves self dealing to the detriment of creditors. The Debtor's management is hopelessly conflicted and cannot be expected to pursue avoidance of transfers to itself.

Spongetech may respond that the fraud involved Spongetech's financials, not Dicon's. This Court should reject that myopic view. Spongetech's inflation of its sales numbers was also a misrepresentation as to Dicon, because Dicon is known to be manufacturing Spongetech's product and hence the Spongetech numbers could not be

correct unless Dicon's own sales were much higher than they were. In effect, Spongetech was using Dicon as a front to perpetuate their scheme, hoping that its legitimate business would be enough to distract observers from the fraud. Moreover, Spongetech's mismanagement of its own affairs has severely damaged Dicon's credibility with vendors and customers.

The Petitioning Creditors are also aware of statements made by Spongetech in documents filed in the SEC Civil Action to the effect that the SEC's allegations involve only past conduct. It is past conduct only because Spongetech, Moskowitz and Metter got caught. Their intention, in fabricating identities and documents for the fictitious customers, was to bamboozle the SEC and investors into believing the customers and the sales figures were real. Had they succeeded, they would still be pursuing their fraudulent scheme today. Moreover, even after the financial fraud was exposed and charges filed, Moskowitz and Spongetech continued to loot Dicon.

B. <u>Appointment of a Trustee Is in the Best Interests of Creditors</u>

Section 1104(a)(2) sets forth an independent and self-sufficient ground for appointment of a trustee where it is in the interests of creditors. In other words, even if fraud or gross mismanagment do not exist, the court should direct the appointment of a trustee if it is the best interest of creditors. *See Bellevue Place Associates v. Caisse Centrale Des Banques Populaires,* 1994 U.S.Dist. LEXIS 17409, at *16 (N.D.Ill. December 6, 1994); *In re The Bible Speaks*, 74 B.R. 511, 512 (Bankr.D.Mass. 1987).

In this case the appointment is in the best interest of creditors because there is a substantial adversity of interest between Dicon and its shareholder/parent, Spongetech, and Dicon lacks sufficient independent management structure to analyze and pursue its

claims against Spongetech for the benefit of Dicon's creditors. Spongetech cannot realistically be expected to sue itself. *See In re Oklahoma Refining*, 838 F.2d 1133 (10th Cir. 1988). Thus, absent appointment of a trustee there will be no party able to discharge a fiduciary duty to all creditors of Dicon. *See Bellevue Place Associates v. Caisse Centrale Des Banques Populaires,* 1994 U.S.Dist. LEXIS 17409, at *17 (inability of debtor in possession to discharge its fiduciary duties to all creditors constitutes cause).

## CONCLUSION

It is vitally important to the interests of Dicon and its creditors that Dicon be placed in the hands of an independent trustee. Allowing its fate to remain in the hands of the irreversibly tainted Spongetech would place the equity holder in control, when it is rather the interests of <u>creditors</u> that should be paramount. It would serve to perpetuate the victimization of Dicon that has already taken place. For the reasons set forth above, the Petitioning Creditors respectfully request that the Court enter an Order directing the appointment of a Chapter 11 Trustee.

Respectfully submitted this 19th day of June, 2010

/s/ Frank J. Perch, III
Frank J. Perch, III
Counsel for Petitioning Creditors
Georgia Bar No. 142225
HUNTER, MACLEAN, EXLEY & DUNN, P.C.
200 East St. Julian Street
P.O. Box 9848
Savannah, GA 31412
Telephone: 912-236-0261
Fax: 912-236-4936

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| In re: | ) | **Involuntary Petition** |
| | ) | **Under Chapter 11** |
| **DICON TECHNOLOGIES, LLC,** | ) | |
| | ) | **Case No. 10-41275 LWD** |
| **Alleged Debtor.** | ) | |
| _____ | ) | |

**ORDER GRANTING MOTION TO APPOINT TRUSTEE**

This matter came before the Court for a hearing on _____, 2010 (the "Hearing") on the motion (the "Motion") of the Petitioning Creditors for an Order appointing a Chapter 11 Trustee for the Debtor. Upon consideration of the Motion, the record in this case, and the matters presented to the Court at the Hearing, and the Court finding that good cause has been shown for the relief requested, it is hereby ORDERED, ADJUDGED AND DECREED, as follows:

1. The United States Trustee is hereby directed to appoint a chapter 11 trustee forthwith.

2. Notwithstanding anything to the contrary in the Federal Rules of Bankruptcy Procedure, the effectiveness of this Order shall not be stayed, and this Order shall be effective immediately upon its entry.

IT IS SO ORDERED, this ____ day of _____, 2010.

_____
**HONORABLE LAMAR W. DAVIS, JR.
UNITED STATES BANKRUPTCY JUDGE**