## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | |
|---|---|
| **In re:** | ) **Involuntary Petition** |
| | ) **Under Chapter 11** |
| **DICON TECHNOLOGIES, LLC,** | ) |
| | ) **Case No. 10-41275 LWD** |
| **Alleged Debtor.** | ) |
| | ) |

### SPONGETECH DELIVERY SYSTEMS INC.'S AND DICON TECHNOLOGIES, LLC'S EMERGENCY MOTION FOR (I) RECONSIDERATION OF THE ORDER APPOINTING A CHAPTER 11 TRUSTEE AND SCHEDULING A HEARING THEREON AND (II) AN IMMEDIATE STAY OF THE ORDER APPOINTING A CHAPTER 11 TRUSTEE AND REQUEST FOR EXPEDITED HEARING

SpongeTech Delivery Systems Inc. ("SpongeTech") and Dicon Technologies LLC

(Dicon, and together with SpongeTech, the "Movants") respectfully submit this emergency

motion (the "Emergency Motion") requesting that pursuant to Rules 7052, 9023, and 9024 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (1) this Court reconsider its

order (the "Order") entered on June 24, 2010 appointing a chapter 11 trustee (the "Chapter 11

Trustee") over the above-captioned debtor (the "Debtor") and schedule a hearing (the "Hearing")

thereon; and (2) this Court stay the Order until the Hearing and/or pending appeal.[1]

---

[1] While the Bankruptcy and Local rules may require a separate motion for each item of relief requested, the Movants respectfully submit that in light of the urgent and timely nature of the relief it requests, and because the facts and arguments that form the basis for the relief they seek are identical, submitting the Emergency Motion in the current form is warranted.

Notwithstanding, the Movants reserve their right to amend the Emergency Motion to supplement it with additional facts, evidence, and analysis of the law relating to reconsideration of orders. Because of the time exigencies currently in place, and the Movants' need for relief prior to the appointment of a Chapter 11 Trustee (which will likely occur imminently), the Movants submit that the Emergency Motion in its current form contains enough facts and information to allow this Court to consider whether to temporarily stay the Order.

## Relevant Facts

1. On June 18, 2010, petitioning creditors (the "Petitioning Creditors") filed an involuntary petition against the Debtor.

2. On June 19, 2010, the Petitioning Creditors filed an emergency motion with this Court to appoint a Chapter 11 Trustee (the "Trustee Motion").

3. On June 21, 2010, an involuntary summons (the "Summons") was issued upon Dicon. Service of the Summons upon the Debtor triggers the 21 day period to respond to the Involuntary Petition. As of the date hereof, there is still ample time to respond to the Involuntary Petition.[2]

4. On June 21, 2010, this Court scheduled a hearing on the Trustee Motion (the "Trustee Motion Hearing") for June 24, at 10:00 a.m.

5. The Movants were informed by the Petitioning Creditors' counsel that they would not be able to participate in the Trustee Motion Hearing telephonically and they had to locate local counsel ("Local Counsel") to represent them.

6. On the morning of June 24, 2010, the Movants' newly retained New York counsel contacted the Judge's Chambers and advised the Judge's law clerk that counsel had just

---

In addition, if the Court does not grant a stay of the Order and a Hearing occurs after the appointment of a Chapter 11 Trustee, the Movants will amend the Motion (i) to seek the removal of the Trustee under Bankruptcy Code section 1105 and (ii) for the Petitioning Creditors to post a bond under Bankruptcy Code Section 303(e) to protect the Movants from the damages that have already begun to occur as a result of the Involuntary Petition. *See* Section III of this Motion.

[2] The Movants reserve their right to seek the dismissal of the Involuntary Petition on the basis of, among other thing, it being a bad faith filing. If this Court determines that the Involuntary Petition was indeed filed in bad faith, the Movants reserve their right to pursue all remedies available to them, including seeking damages and punitive damages under section 303(i)(2) of title 11 of the United States Code (the "Bankruptcy Code").

been retained and requested that the 10:00 a.m. hearing be adjourned for a short period of time so that the Movants could retain Local Counsel.

7. The Court determined that the matter needed to move forward and granted New York counsel a brief reprieve to retain Local Counsel. The Court adjourned the Trustee Motion hearing to 3:00 p.m. that same day.

8. Despite the Movants' frantic attempts to retain Local Counsel, because proposed Local Counsel was in Court out of Savannah, Movants were not able to do so until about two hours prior to the Trustee Motion Hearing. Again, the Court graciously adjourned the hearing from 3:00 p.m. until 5: 00 p.m.

9. New York counsel was invited to listen in on the Trustee Motion Hearing telephonically but was not permitted to speak, but for a very brief closing remark. Newly retained Local Counsel attended in person. The Trustee Motion Hearing proceeded for some three hours during which time counsel for the Petitioning Creditors examined two witnesses. The first witness, Rosalind Nathanial ("Ms. Nathaniel"), Dicon's controller, was on the stand for more than one hour during which time the well prepared witness was questioned regarding many aspects of Dicon's business by the Petitioning Creditors' counsel. Newly retained Local Counsel and New York counsel were prepared enough only to ask limited questions and, given the time constraints, were not able to present rebuttal witnesses. As a result, this Court was given only one side of the story, which contained many inaccurate or unsupported allegations.

10. Immediately after the Trustee Motion Hearing, the Court entered the Order ordering the United States Trustee (the "U.S. Trustee") to appoint a Chapter 11 Trustee and ordered additional injunctive relief.

## Summary of Argument

11. The Movants submit that the relief requested in this Emergency Motion is warranted and necessary for the following 3 reasons:  (1) the Court was presented with inaccurate testimony at the Trustee Motion Hearing, (2) the Movants were denied their due process right of presenting evidence to the Court, and (3) SpongeTech and Dicon will be irreparably harmed by the appointment of a Chapter 11 Trustee.

12. Had the Movants had the opportunity to present their own witnesses, this Court would have learned that SpongeTech never misused Dicon's funds, and that SpongeTech and Dicon were considerably integrated.  In fact, it would be virtually impossible for Dicon to serve as a going concern without SpongeTech and its capital and services.

13. Bankruptcy Rule 9024 provides the following grounds for the relief sought in this Motion:

> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Fed. R. Civ. P. 59;
>
> (3) fraud (intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4) the judgment is void;
>
> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> (6) any other reason that justifies relief.

14. The Movants submit that several of the factors enumerated in Bankruptcy Rule 9024 are present in the instant case, as set forth more fully below.

## Argument

### I. The Order Was Entered On the Basis of False and Misleading Testimony and Should Therefore be Reconsidered, or, at the Very Least, Temporarily Stayed

15. Ms. Nathaniel, the Petitioning Creditors' primary witness at the Trustee Motion Hearing provided the Court with inaccurate testimony.

16. The following is a selection of inaccurate statements uttered by Ms. Nathaniel (the "Inaccurate Statements") at the Trustee Motion Hearing and a comparison between the Inaccurate Statements on the one hand, and the truth on the other.

| Inaccurate Statements[3] | The Truth |
|---|---|
| At the time Dicon was purchased it was a financially healthy company. | At the time Dicon was purchased by SpongeTech in July of 2009, Dicon was on the verge of collapse.  In fact, Dicon had reached its bank credit limit and had been unable to obtain additional funds to run its operations. SpongeTech rescued Dicon because Dicon was SpongeTech's primary supplier. *See* Affidavit of Steve Moskowitz (the "Moskowitz Affidavit"), at ¶ 4. |
| Dicon was a victim of SpongeTech's actions. | This statement is False.  Due to the limited ability to conduct due diligence prior SpongeTech's purchase of Dicon, SpongeTech was not aware that representations made by Dicon's former owner (the "Former Owner") were inaccurate and false.  Among other things, the Former Owner misrepresented Dicon's gross profits and sales. Moreover, after the purchase of Dicon, the Movants learned that Dicon's books and records did not |

---

[3] All statements referred to herein are based upon the testimony of Ms. Nathanial.  The statements contained herein are not direct quotes, but a paraphrasing as the transcript from the Trustee Motion Hearing is not yet available.

| | |
|---|---|
| | reflect all of Dicon's outstanding payables. Ms. Nathaniel, who worked for Dicon prior to SpongeTech's acquisition thereof, was responsible for the faulty payables records. *Id.* at ¶¶ 4-5. |
| Dicon's cash flow was directed to SpongeTech even after Steven Moskowitz's arrest. Because the money was redirected, Dicon was rendered insolvent. | From the day SpongeTech purchased Dicon, it infused it with considerable capital so that it could pay its bills and employees (including infusing Dicon with $1 million between July 2009 and February 2010). Given the integrated nature of the two companies (which is set forth more fully in section III of this Emergency Motion), SpongeTech utilized Dicon's cash to pay many of the Movants' mutual vendors. Many of the transfers referenced by Ms. Nathaniel followed payments by SpongeTech to Dicon's creditors *Id.* at ¶ 6. |
| Ms. Nathanial stated that she was aware of Dicon's payables and receivables. | While Ms. Nathanial may have knowledge about payables and receivables relating only to Dicon, she was not privy to the many payables that were due on behalf of both companies *Id.* at ¶ 9. |
| Barry Kolevzan (SpongeTech's former executive vice president) asked that transfers be made to different entities, and debit cards were used to withdraw cash. | Payments and withdrawals were made to pay Dicon's expenses or for reimbursement to SpongeTech for paying Dicon's obligations. *Id.* at ¶ 12. |
| Ms. Nathaniel stated she did not know why transfers were made to SpongeTech because there were no amounts due to SpongeTech. | As set forth above, SpongeTech advanced over $1 million to Dicon since its purchase of Dicon. In addition (i) SpongeTech paid many of Dicon's obligations, (ii) SpongeTech has several of Dicon's employees on its payroll, (iii) SpongeTech provides office space to Dicon, (iv) SpongeTech sells Dicon's products on its website (Dicon does not have the capacity for web sales), and, most importantly, (v) SpongeTech provides customer support to Dicon's customers, SpongeTech processes *ALL* of Dicon's EDI[4] orders, including Wal-Mart, Sears, K-Mart, and Walgreens,. *Id.* at ¶ |

---

[4] The Electronic Date Interface is a complex process whereby sellers provide certain data to large customers, which is a necessary prerequisite to getting paid. In the instant case, SpongeTech processed the EDI for all Dicon's sales to such large retail chains as Wall-Mart, Sears, Kmart and Walgreens, which accounts for a significant portion of Dicon's revenue.

| | 6, 10. |
|---|---|
| Ms. Nathaniel did not know why transfers were made to RM Enterprises, Vanity Events or America's Cleaning Company and stated that no amounts were due to these entities. | RM Enterprises, Vanity Events and America's Cleaning Company advanced money to pay Dicon's obligations and were therefore entitled to reimbursement. *Id.* at ¶ 12. |
| Ms. Nathaniel did not know why transfers were made to Leisure Time and stated that there was no amount due to Leisure Time. | Ms. Nathaniel was fully aware of the amounts due to Leisure Time. The payments made to Leisure Time were commissions Leisure Time rightfully earned for facilitating sales to Wal-Mart. *Id.* |
| Ms. Nathaniel did not know why transfers were made to the Chicago Blackhawks and stated that the Chicago Blackhawks were not owed any Money by Dicon. | The Chicago Blackhawks provided promotional advertisement for SpongeTech's and Dicon's products and were therefore entitled to payment. *Id.* |
| Hundreds of cash withdrawals were made by Mr. Moskowitz from February 28, 2010 through May 18, 2010. | All cash withdrawals made by Mr. Moskowitz were made for business purposes including Dicon's operations in New York. *Id.* at ¶ 11-12. |
| $9,000 (cash and bank window transactions) were taken from the accounts after Ms. Nathaniel advised that she did not have enough money to make payroll in early May 2010. | Cash was withdrawn to fund travel expenses of sales representatives, which benefited both companies. *Id.* |
| On May 5, 2010 Ms. Nathaniel closed accounts and reopened new accounts because of the indictment. | Ms. Nathaniel closed the accounts without permission from the Board of Directors. Ms. Nathaniel was severely reprimanded for such action, which harmed both SpongeTech and Dicon. |
| SpongeTech took $787,000 from Dicon. | The $787,000 belonged to SpongeTech and was payment for goods sold to Wal-Mart by SpongeTech. Because SpongeTech used Dicon's vendor number (see ¶ *infra*), the money flowed through Dicon. In fact, SpongeTech sold more than $787,000 worth of product to Wal-Mart, and allowed Dicon to keep a portion of the money. *Id.*. at 11-12, 16. |
| Wachovia Bank froze Dicon's accounts because of check kiting. | Wachovia closed the account because an unauthorized user was writing checks from the account. The bank shut the account leaving outstanding checks unpaid; no misconduct was committed by SpongeTech or its officers. *Id.* at ¶ 15. |
| The company has no plans for the future. | The Movants have specific and detailed plans that will enable Dicon to flourish. Ms. Nathaniel was not advised of the Movants' plans and, as such, is unable to testify with respect to Dicon's future. *Id.* at ¶ 7. |

| Mr. Moskowitz was indicted on May 5, 2010 | Mr. Moskowitz was never indicted. *Id.* at ¶ 19. |

17. This Court understandably appointed a Chapter 11 Trustee after hearing Ms. Nathaniel's damning testimony. However, Ms. Nathaniel's testimony was either false or without direct and sufficient knowledge of the operations of the Movants.[5] The Movants believe that in light of the facts now presented, and additional facts that they will present at the Hearing, this Court should reconsider and stay its Order.

## II. The Movants were Denied their Procedural and Due Process Rights to Present Their Own Evidence

18. The Trustee Motion Hearing was scheduled on an emergency basis with less than 2 days notice. The Movants' New York general counsel was retained merely days before the Trustee Motion Hearing, and was not allowed to participate in the hearing (other than to inform the Court that she could not hear the proceeding over the phone and to make a brief closing remark). The Movants' Local Counsel was retained a mere two hours prior to the Trustee Motion Hearing and did not have an opportunity to become informed so that they could adequately present the facts necessary to clarify the record. Moreover, the Movants' primary witness, Steve Moskowitz ("Mr. Moskowitz"), was in New York, and, because of certain restrictions on his travel, could not appear at the hearing on such short notice. Importantly, the entire basis for the Trustee Motion was *alleged* misdeeds by Mr.

---

[5] Importantly, the Movants were in the process of an internal restructuring and integration, and Ms. Nathaniel was aware that her contract, which expires on June 30th, would not be renewed. Ms. Nathaniel is therefore a unique beneficiary of the involuntary bankruptcy.

Moskowitz. To enter the Order without hearing testimony from Mr. Moskowitz, or allowing Mr. Moskowitz to appear, is unfair.[6]

19. In light of the above, the Movants submit that their due process rights were violated because (i) it was impossible to have fully informed counsel at the Trustee Motion Hearing who could properly cross examine Ms. Nathaniel and shed light on the Inaccurate Statements she made, and (ii) the Movants were effectively denied the ability to present their own witnesses at the Hearing. Therefore, the Movants respectfully request a short stay of the Order, at least until such time as they can be allowed to present their own evidence to the Court, so that the Court can be made fully aware of the totality of the facts and circumstances.

### III. The Appointment of a Chapter 11 Trustee will Cause Immediate, Irreparable Harm to SpongeTech and Dicon

20. As a court of equity, bankruptcy courts will "balance the equities" that could have a significant impact on parties-in-interest. *Gulf States Utils. v. Ala. Power Co.*, 824 F.2d 1465, 1471 – 73 (5th Cir. 1987).

---

[6] Moreover, Bankruptcy Rule 2001.1 states "a motion for an order to appoint a trustee or examiner . . . shall be made in accordance with Rule 9014." Bankruptcy Rule 9014(e) states that "The court shall provide procedures that enable parties to ascertain at a reasonable time before any scheduled hearing whether the hearing will be an evidentiary hearing at which witnesses may testify." F. Fed R. Bankr. P. 2001.1 (emphasis added). The Movants respectfully submit that they were not aware of any procedures enabling them to ascertain whether the Trustee Motion Hearing would be one at which witnesses could testify. Such procedures are important because it would have enabled the Movants to work with the Court and the Petitioning Creditors to arrive at an arrangement whereby the Movants would have the opportunity to present their own witnesses.

21. In the instant case, appointing a Chapter 11 Trustee will significantly harm both Dicon and SpongeTech. On the other hand, staying the Order for a few days pending a Hearing will not cause any harm to either entity.

22. Notwithstanding Ms. Nathaniel's Inaccurate Statements to the contrary, the truth is that SpongeTech and Dicon rely on each other for their respective businesses. The appointment of a Chapter 11 Trustee will harm Dicon and SpongeTech in the following manner:

## A. Harm to Dicon.

23. _Commissions._ A significant portion of Dicon's sales pertains to product and inventory actually owned by SpongeTech ("SpongeTech's Products"). Dicon, in turn, receives a commission for the sale of such products (the "Commission"). The Chapter 11 Trustee will, without explicit consent from SpongeTech, have no right to sell SpongeTech's Products, thus depriving Dicon of the Commissions. _Id._ at ¶ 10, 16.

24. _Licensed Products._ Dicon currently sells many items pursuant to licensing rights held only by SpongeTech (the "Licensed Products"). For example, some of Dicon's highest selling items include SpongeBob Squarepants ("SpongeBob") and Dora the Explorer ("Dora") sponges for children. The manufacture and sale of the SpongeBob and Dora sponges are allowed pursuant to licensing agreements that SpongeTech (and only SpongeTech) entered into with Nickelodeon. Similarly, Dicon sells other Licensed Products pursuant to licensing agreements held by SpongeTech, including agreements with Marvel Comics and MGM. Without SpongeTech's explicit consent, The Chapter 11 Trustee would have no right to sell the Licensed Products, further depriving Dicon of important revenue streams. _Id._

25. Sales. SpongeTech currently employs many of Dicon's sales people. Moreover, two of Dicon's sales/business staff are located at SpongeTech's corporate headquarters in New York City. In addition, SpongeTech processes all of Dicon's web-based sales through SpongeTech's website. Dicon does not have the capacity to sell its products over the web. The appointment of a Chapter 11 Trustee would cause serious complications for both Dicon and SpongeTech, and may harm Dicon's sales capacity. *Id.*

26. Operations. Many of the functions necessary to maintain Dicon's operations are performed by SpongeTech. For example, SpongeTech employees process many of Dicon's purchase orders and provide customer service support for Dicon's customers. *Id.*

27. EDI. SpongeTech processes the entire Electronic Data Interface (the "EDI") for Dicon. The EDI is a complex process whereby sellers provide certain data to large customers, which is a necessary prerequisite to getting paid. In the instant case, SpongeTech processed the EDI for all Dicon's sales to such large retail chains as Wal-Mart, Sears, Kmart and Walgreens, which accounts for a significant portion of Dicon's revenue. Without SpongeTech's processing of Dicon's EDI, Dicon's would not get paid for such sales. Dicon needs SpongeTech's EDI and other services to survive. *Id.*

28. Importantly, SpongeTech will not take any action with the intention of harming Dicon. Dicon is SpongeTech's wholly owned subsidiary and SpongeTech will do everything it can, even if this Court denies this Motion for Reconsideration, to assist Dicon and preserve it as a going concern. However, to the extent Dicon is selling SpongeTech's Products and the Licensed Products and is using SpongeTech's employees and facilities, SpongeTech rightfully seeks to ensure that its rights will be protected and that it will be adequately compensated.

**B. Harm to SpongeTech**

29. <u>Sales.</u>  SpongeTech currently sells its products to customers who have relationships and agreements only with Dicon.  For example, one of the assets that SpongeTech bought when it purchased Dicon was Dicon's Wal-Mart "vendor number."[7]  SpongeTech now sells many of its products to Wal-Mart using Dicon's vendor number.  If SpongeTech were deprived of this right, it would sustain significant damage. The appointment of a Chapter 11 Trustee could deprive SpongeTech of these important sales channels.  This would cause a significant dent in SpongeTech's sales, which is not in the best interest of SpongeTech or Dicon.  *Id.* at ¶ 10, 16.

30. <u>Intellectual Property.</u>  SpongeTech currently sells certain items that contain intellectual property owned by Dicon.  The appointment of a Chapter 11 Trustee may deprive SpongeTech of the right to sell such products, further causing financial harm to SpongeTech.  Again, this is neither in the interest of SpongeTech nor Dicon.  *Id.* at ¶ 10, 16.

31. <u>Loss of Factor.</u>  As a result of the Involuntary Petition, the Movants' factoring company, Goodman Factors, has ceased purchasing the Movants' receivables.  This has resulted in an immediate liquidity crunch for SpongeTech and Dicon.  *Id.* at ¶ 10, 16.

32. <u>Loss of Investment.</u>  Finally, and most importantly, SpongeTech purchased Dicon from the Former Owner for approximately $4.8 million in July of 2009.  Since that time, SpongeTech has infused over $1,000,000 into Dicon.  Although Dicon is suffering financially, SpongeTech desperately wants to see Dicon survive and thrive and intends to infuse Dicon with additional capital.  Indeed, SpongeTech believed and still believes that

---

[7] In order to sell to Wall Mart and other large stores, one must first obtain a vendor number from them.

it will realize significant returns on the Dicon investment. Appointing a Chapter 11 Trustee who would have the right to sell Dicon and its assets would forever deprive SpongeTech from reaping the benefits of the millions of dollars it invested in Dicon. *Id.* at ¶ 10, 16.

33. As set forth above, notwithstanding the Inaccurate Statements to the contrary, Dicon and SpongeTech are more inextricably intertwined than Ms. Nathaniel led this Court to believe. The appointment of a Chapter 11 Trustee has the potential to cause serious harm to SpongeTech and Dicon. Therefore, as the parent of Dicon, SpongeTech respectfully requests that this Court postpone the appointment of a Chapter 11 Trustee at least until the Hearing, where all the relevant facts may be brought to light, all parties are adequately represented and may present witnesses, and this Court could make a fully informed decision based on all the facts, rather than just the facts presented by the Petitioning Creditors.

## Notice

34. Notice of this motion has been provided to by electronic mail to (i) counsel to the Petitioning Creditors, (ii) Ms. Rosalind Nathaniel, and (iii) The U.S. Trustee. The Movants submit that pursuant to Rule 5(b)(2)(D) of the Federal Rules of Civil Procedure, such service is sufficient.

## Conclusion

35. The relief sought by the Movants is urgent and necessary as the appointment of a Chapter 11 Trustee will cause immediate, irreparable harm to Dicon and SpongeTech. The relief sought is also warranted in light of the Inaccurate Statements made to the Court by Ms. Nathaniel. The relief is further warranted because the Movants did not have the

opportunity to adequately prepare for the Trustee Motion Hearing because Local Counsel

was retained **two hours** before the Trustee Motion Hearing, and because the Movants

were effectively denied their due process right to present their own witnesses.

**WHEREFORE**  In light of the forgoing, the Movants respectfully ask this Court to

schedule an expedited hearing, and grant the Motion grant the relief sought herein and such

other and further as this Court deems just and proper.

This the 28th day of June, 2010.

Kathleen Horne
Georgia Bar No. 367456
Dolly Chisholm
Georgia Bar No. 129422
Margaret S. Puccini
Georgia Bar No. 654880

**INGLESBY, FALLIGANT, HORNE,
COURINGTON & CHISHOLM, P.C.**
17 W. McDonough St.
P.O. Box 1368
Savannah, GA 31401
912 232-7000 Telephone
912 238-0286 Fax


Of Counsel:

Rochelle Weisburg
Edward E. Neiger, Esq.
NEIGER LLP
111 John Street, Suite 800
New York, NY  10038
212 267-7342 Telephone
212 918-3427 Fax

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| In re: | ) Involuntary Petition |
| | ) Under Chapter 11 |
| DICON TECHNOLOGIES, LLC, | ) |
| | ) Case No. 10-41275 LWD |
| Alleged Debtor. | ) |
| | ) |

### AFFIDAVIT OF STEVEN MOSKOWITZ IN SUPPORT OF EMERGENCY MOTION

| | | |
|---|---|---|
| STATE OF NEW YORK | ) | |
| | ) | ss.: |
| COUNTY OF NEW YORK | ) | |

Steven Moskowitz, being duly sworn, deposes and says:

1.     I have been a director of SpongeTech Delivery System ("SpongeTech") since 2002; I have been SpongeTech's Chief Financial Officer since 2006; and I have been SpongeTech's Chief Operating Officer since December, 2008.

2.     I am fully familiar the operations of SpongeTech and Dicon Technologies, LLC ("Dicon," and, together with SpongeTech, the "Movants").

3.     SpongeTech purchased Dicon in mid-2009 for approximately $4.8 million. At the time, Dicon was on the verge of collapse. Dicon had reached its bank limit and was unable to get additional funds to run its operations. SpongeTech decided to purchase Dicon because Dicon was SpongeTech's primary supplier of goods.

4.     SpongeTech only had a few weeks to conduct Due Diligence before deciding whether to buy Dicon. Because of this, it did not discover that Dicon's former owner misrepresented facts to SpongeTech prior to the sale and that Dicon's books and records were faulty.

5.     In addition, Dicon's obligations were understated.  Rosalind Nathaniel (Ms. "Nathaniel"),
Dicon's controller, was in charge of keeping an accurate record of Dicon's obligations.

6.     In an effort to save Dicon, SpongeTech infused it with significant capital (thus far over
$1,000,000), which went toward covering Dicon's obligations to its vendors and employees.

7.     The business strategy of SpongeTech was to fully integrate the two companies, thus
reducing redundancies and enhancing efficiency.  This process was well under way, as set forth
below.

8.     SpongeTech and Dicon have many mutual vendors, whom SpongeTech would often pay;
as a result, SpongeTech often paid many of Dicon's obligations.

9.     While Ms. Nathaniel was the controller of Dicon, she was not aware of many of the
mutual vendors that the Movants had.  She was also not aware of the long term plan for the
integration of the Movants, which was known only at the parent level.

10.    In addition, SpongeTech provided essential services to Dicon in the following ways:

      a.  SpongeTech has several of Dicon's employees on its payroll,

      b.  SpongeTech provides office space to Dicon,

      c.  SpongeTech provides customer support to Dicon's customers;

      d.  SpongeTech sells Dicon's products for Dicon on its website.  Dicon does not
         have the capacity for web-based sales; and, most importantly

      e.  SpongeTech processes the Electronic Data Interface (the "EDI") for Dicon.
         The EDI is a complex process whereby sellers provide certain data to large
         customers, which is a necessary prerequisite to getting paid.  In the instant
         case, SpongeTech processed the EDI for all Dicon's sales to such large retail
         chains as Wall-Mart, Sears, Kmart and Walgreens, which accounts for a

significant portion of Dicon's revenue. Without SpongeTech's processing of Dicon's EDI, Dicon's would not get paid for such sales. Dicon need's SpongeTech's EDI and other services to survive.

11.    All cash and other withdrawals referred to by Ms. Nathaniel at the hearing on June 24, 2010 (the "Trustee Motion Hearing") were for proper business purposes, including paying Dicon's obligations and reimbursing SpongeTech for paying Dicon's obligations.

12.    By way of example:

      a.    Cash was, on occasion, withdrawn to fund travel expenses of sales representatives of SpongeTech and Dicon,

      b.    On occasion, RM Enterprises, Vanity Events and America's Cleaning Company would advanced money to pay Dicon's obligations and would thereafter be reimbursed,

      c.    The Chicago Blackhawks provided promotional advertisement for the Movants, and

      d.    Dicon paid Leisure Time commissions for facilitating sales to Wal-Mart.

13.    Moreover, a significant portion of Dicon's sales pertains to product and inventory actually owned by SpongeTech. Dicon receives a commission for the sale of SpongeTech's products.

14.    In fact, SpongeTech currently has approximately $1 million in inventory in Dicon's warehouse.

15.    Wachovia froze the account referred to by Ms. Nathaniel at the Trustee Motion Hearing, because an unauthorized user was writing checks from the account, not because of any improper action by SpongeTech's principals.

16.     As set forth above, SpongeTech and Dicon were in the process of becoming integrated.
As such,

      a.  Dicon currently sells many items pursuant to licensing rights held only by
          SpongeTech, including SpongeBob Squarepants and Dora the Explorer
          sponges for children.  In addition, Dicon sells many of SpongeTech's
          merchandise, for which Dicon receives a commission.

      b.  SpongeTech currently employs many of Dicon's sales people.  Two of
          Dicon's sales/business staff are located at SpongeTech's corporate
          headquarters in New York City.

      c.  Many of the functions necessary to maintain Dicon's operations are performed
          by SpongeTech.  For example, SpongeTech employees process many of
          Dicon's purchase orders and provide customer service for Dicon's customers.

      d.  SpongeTech currently sells its products to customers who have relationships
          and agreements only with Dicon.  For example, one of the assets that
          SpongeTech bought when it purchased Dicon was Dicon's Wall-Mart "vendor
          number."[1]  SpongeTech now sells many of its products to Wal-Mart using
          Dicon's vendor number.  If SpongeTech were deprived of this right, it would
          sustain significant damage.

      e.  SpongeTech currently sells certain items that contain intellectual property
          owned by Dicon.

---

[1] In order to sell to Wall Mart and other large stores, one must first obtain a vendor number from them.

17.    As a result of the Involuntary Petition, the Movants' factoring company Goodman

Factors ("Goodman") has ceased purchasing the Movants' receivables.  This is currently

harming Dicon and SpongeTech.

18.    I have nothing but Dicon's best interests at heart.  If Dicon fails or is liquidated, it would

have a detrimental effect on the SpongeTech family of Companies.

19.    Finally, I was never indicted.

_____
Steven Moskowitz

        Sworn to and subscribed before me this
        _28_ day of June, 2010

_____
Notary Public

            MOSHE KRANCZER
    NOTARY PUBLIC, STATE OF NEW YORK
            NO. 41-4878598
        QUALIFIED IN QUEENS COUNTY
    COMMISSION EXPIRES NOV 24, 2012

# EXHIBIT B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | |
|---|---|
| In re: | ) **Involuntary Petition** |
| | ) **Under Chapter 11** |
| **DICON TECHNOLOGIES, LLC,** | ) |
| | ) **Case No. 10-41275 LWD** |
| **Alleged Debtor.** | ) |
| | ) |

### ORDER SCHEDULING A HEARING TO RECONSIDER THE ORDER APPOINTING A CHAPTER 11 TRUSTEE AND SCHEDULING A HEARING THEREON (II) STAYING ORDER APPOINTING A CHAPTER 11 TRUSTEE

Upon the emergency motion (the "Emergency Motion")[1] of the Movants for (1) this Court to reconsider its Order appointing a Chapter 11 Trustee and (2) an immediate stay of the order until the Hearing and/or pending appeal; and upon the Affidavit of Steve Moskowitz annexed as an exhibit to the Emergency Motion; and upon notice of the Emergency Motion having been properly served under Rule 5(b)(2)(D) of the Federal Rules of Civil Procedure; it is hereby

ORDERED that the Emergency Motion is granted to the extent provided herein; and it is further

ORDERED that a Hearing to reconsider the Order is scheduled for _____ (the "Hearing Date"), and it is further

ORDERED that the Order shall be stayed until the later of (i) the Hearing Date or (ii) 14 days from the date of the order, and it is further

---

[1] Capitalized terms contained herein shall have the meaning ascribed to them in the Emergency Motion.

ORDERED, that each party shall provide the Court and each other with a brief setting forth its arguments and positions, and a list of witnesses that each party intents to present not less than _____ days prior to the Hearing Date, and it is further

ORDERED that the 14 day stay under Bankruptcy Rule 8002 is hereby waived.

Dated: Savannah, Georgia

June _____, 2010

_____
Lamar W. Davis, Jr.
UNITED STATES BANKRUPTCY JUDGE

CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2010, I electronically filed the SpongeTech

Delivery Systems Inc.'s and Dicon Technologies, LLC's Emergency Motion for (I)

Reconsideration of the Order Appointing a Chapter 11 Trustee and Scheduling a Hearing

Thereon and (II) an Immediate Stay of the Order Appointing a Chapter 11 Trustee and

Request for Expedited Hearing using the CM/ECF system which will send notification of

such filings to the following:


U.S. Trustee            Frank J. Perch, III


and Via Email to:


Rosalind Nathaniel
rosalind@dicontech.com


This the ___28___ day of June, 2010.

_____
Kathleen Horne, attorney for
Movants

INGLESBY, FALLIGANT, HORNE, COURINGTON & CHISHOLM, P.C.
Post Office Box 1368
Savannah, Georgia  31402-1368
(912) 232-7000