# In the United States Bankruptcy Court
## for the
### Southern District of Georgia
#### Savannah Division

**FILED**

Samuel L. Kay, Clerk
United States Bankruptcy Court
Savannah, Georgia
By lbarnard at 12:01 pm, Sep 24, 2010

In the matter of:                               )
                                                )        Chapter 11 Case
DICON TECHNOLOGIES, LLC                         )
                                                )        Number 10-41275
                        *Debtor*                )

## MEMORANDUM OPINION
## ON MOTION FOR ORDER AUTHORIZING
## AND APPROVING SALE AND FOR OTHER RELIEF

The trial of the above-captioned Motion, Doc. No. 121, pursuant to notice, was conducted on September 23, 2010. For the reasons stated herein, the Motion will be granted. This Opinion is entered for the purposes of memorializing the findings upon which my ruling is based.

## FINDINGS OF FACT

The Debtor's case was initiated as an involuntary petition filed on June 18, 2010. On June 29, 2010, an Order for Relief under Chapter 11 was entered. On June 24, 2010, the Court entered an Order granting the United States Trustee's Motion for Appointment of a Chapter 11 Trustee. Order, Dckt. No. 13. On July 9, 2010, Lloyd T. Whitaker was appointed by the United States Trustee to serve in that capacity and immediately went to work to take control of the company and to assess its prospects for reorganization. Ultimately, the Motion that is the subject of this Opinion was filed on

August 31, 2010, and supplemented on September 17, 2010.

For some period of time Dicon was operated as an independent company by Wayne Celia and others. In July 2009 the company was sold for some $4.8 million to SpongeTech Delivery Systems, Inc., ("SpongeTech"). Celia continued to manage Dicon's operations under an employment contract and a related non-compete agreement until March 2010 when, apparently as a result of substantial business reversals, he was terminated and new management was put in place by SpongeTech.

The proposed sale to JKA, Inc., d/b/a Diversified Distribution and Diversified Technologies, LLC ("Buyer")—entities in which Celia is apparently a principal owner—is now sought by the Chapter 11 Trustee and opposed by SpongeTech through its court appointed Chapter 11 Trustee, Kenneth P. Silverman, who was appointed in its bankruptcy case pending in the Southern District of New York. Facts introduced at this hearing establish that:

(1) Dicon has no current manufacturing operations.

(2) Dicon currently has only nine employees remaining out of a work force that reached sixty employees earlier this year.

(3) Few if any of its vendors are shipping product to it and none are offering any payment terms other than cash on delivery.

(4) While customers are still ordering Dicon products, the volume is down significantly and there have been many cancelled orders. Some of Dicon's business has migrated to competitors of Dicon—including Diversified—either as a result of Debtor's failure to fulfill orders, solicitation of business by these competitors, or both. The few remaining customers that it has are becoming disenchanted and are looking for alternative sources of product.

(5) Dicon has no working capital with which to fund future operations. The books and records of the company reveal that post-petition accounts payable and accrued, but unpaid, secured payments for July and August 2010 exceed $135,000.00. August Operating Report, Exh. DT3, Post-Petition Accounts Payable, Secured Payments Report.

(6) The company's profit and loss statement shows a slight positive cash flow. If, however, the accrued payables and secured payments were remitted, the company would show severe negative cash flow. Id. at Schedule of Receipts and Disbursements.

3

AO 72A
(Rev. 8/82)

(7)   The company's books and records also reveal substantial payments to or for the benefit of SpongeTech or insiders of SpongeTech. Although there has been no final tracing or accounting of the funds to establish the precise amount or to establish what portion, if any, of the funds might have been applied to legitimate obligations of Dicon to SpongeTech, the best evidence available to the Court is that transfers of this type during 2010 exceed $800,000.00 and offsetting payments from SpongeTech to Dicon do not exceed $35,000.00.

(8) Within a matter of days of Whitaker's appointment as Chapter 11 Trustee, he traveled to Bryan County, Georgia to inspect the manufacturing facility.  He learned about the process and the product which the Debtor manufactured and marketed and took an extensive look at the books and records of the company in conjunction with the comptroller, Ms. Nathaniel.  He discovered that there was less than $1,000.00 cash on hand, that the inventory was not in good shape, and that the company had not been engaged in manufacturing any product for quite a while.  He discovered the company had been losing customers, either because of its inability to fulfill existing orders or because of the competitive marketing efforts of competitors in the industry.  He concluded that the company could not resume operations as a going concern without an infusion of $350,000.00 to $500,000.00 in working capital.  Within a matter of days he met with the principals of Taikone (the company formerly known as Dicon Pacific) in order to attempt to reinstitute a supply chain.  This ultimately proved to be unfeasible. He decided that the only way to

4

AO 72A
(Rev. 8/82)

preserve value in the company—which was incurring continuing costs, expenses, and accrued secured payments which it could not make—was to find a buyer for the operating assets of the company.

(9) Although the company showed a significant value in its inventory of some $800,000.00—on a cost basis, located both on and off site—Whitaker learned that some of the inventory was out-of-date or packaged in labels prepared for customers who had cancelled or were not placing any further orders and therefore much of the inventory was of limited, if any, value.

(10) It soon became obvious to Whitaker that the company would never, in fact, reenter an operational manufacturing phase without an infusion of working capital. Perhaps equally as important is the fact that the equipment used to manufacture the company's products is considered functionally obsolete. He learned that the newer generations of equipment used to produce the same product require much less labor. Any attempt to restart manufacturing would not restore an economically competitive company, even if the working capital were available.

(11) It was stipulated at the hearing that Debtor leases a building, land, and all of its equipment from the Bryan County Development Authority ("Bryan County") under a twenty year lease with monthly payments of $16,000.00 per month. The

5

AO 72A
(Rev. 8/82)

building is in excellent condition, however, as noted above, the equipment is not the most efficient, latest generation equipment. The Debtor was in default of its lease obligations when the case was filed, has not made post petition payments, the potential Bryan County claim if the lease were to be rejected would be approximately $576,000.00, and it would dilute any dividend to creditors.

(12) Whitaker is a highly qualified and experienced Chapter 11 Trustee, having served in many cases. He believed he was able—without the outside expertise of appraisers, auctioneers, or financial advisors—to make an assessment of the going concern value of the business. He quickly reached the conclusion that the best solution would be to sell the operating assets of the company, have the purchaser assume the lease obligation to Bryan County, and pay whatever dividend could be generated for creditors that might result.

(13) Whitaker met with a number of companies that had an interest in purchasing the operating assets of the company. He ultimately had substantive discussions with nine separate entities, of which he believed seven had the financial capability to effectuate a sale. Those nine entities executed confidentiality agreements and some of them made at least one site visit to the plant facility in Bryan County, Georgia. The offer made by the Buyer in this Motion was the only bid received and it became the subject of the Trustee's Motion for Authority to Sell which provided a period of time within which competing bids

could be received.  Whitaker believed that one other bid would be made, but it never materialized.  He now urges the Court to approve this sale because the company's business is spiraling down, accrual of expenses threatens to consume any possible payment to creditors in the case and there is no prospect, as noted above, for a restart of the manufacturing.

(14) Whitaker believes that he had a potential claim against H.H. Brown Company ("Brown") and the Buyer because of a termination of intellectual property licenses Brown had granted to Dicon.  Brown sent a notice of termination which Whitaker believed was legally ineffective and because Brown had already relicensed the intellectual property to the purchasers, Whitaker thought he might have a claim against Brown. Whitaker's counsel drafted a lawsuit asserting a cause of action stemming from the alleged wrongful termination and subsequent relicense.  Complaint, Exh. DT7.  He made the potential defendants aware that he was investigating such a lawsuit.   As a result of negotiations, Buyer ultimately agreed to a sale which would yield $625,000.00 in cash, plus a $100,000.00 cure payment to Bryan County, plus an assumption by the purchaser of the lease that the company has with Bryan County, thereby avoiding a potentially large claim for the rejection of the lease. Coupled with the sale is an agreement for Dicon to release certain parties from any liabilities they might otherwise be alleged to have to Dicon, but no release impairs any claim of SpongeTech against the released parties.

7

(15) The value of the sale, subject to some adjustments, is $725,000.00 cash, and the non-cash value of avoiding of a lease rejection claim of $576,000.00 will further enhance the dividend to unsecured creditors.

Whitaker believes total administrative costs in the case will be $500,000.00 or less, which, coupled with the potential economic benefit of the sale would yield a dividend to creditors in the case.  He acknowledges that it is not an ideal outcome, and that the negotiations for the sale and the proposal to sell under these terms occurred in an unusually quick fashion, but he believes that all of the applicable elements for approval of the sale have been met.

The Motion is vigorously opposed by the SpongeTech Chapter 11 Trustee, Mr. Silverman, and his counsel, who participated actively in the trial and who have argued two points: first that the Trustee has not made out an evidentiary case supporting the elements necessary for approval; second that there has been no evidentiary showing to support this Court's reaching a factual finding that the purchaser has proceeded in good faith within the meaning of § 363(m).  Because that is an essential element of the transaction, this Court must rule on that point as a threshold matter.

<u>CONCLUSIONS OF LAW</u>

In assessing whether the purchaser has proceeded in good faith within the

meaning of § 363(m), I adopt the definition of good faith in In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3rd Cir. 1986). In Abbots the debtor/seller's CEO was shown to have reached an understanding with the purchaser concerning future employment. The court found that the sale was "ripe for collusion" between buyer and debtor and remanded the case for a determination concerning good faith. It articulated a test which focuses on the "integrity of [purchaser's] conduct in the course of the sale proceedings" and whether there is "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." Id. at 147. It did not suggest that pre-petition actions by a purchaser are relevant as to a determination of good faith. See In re Colony Hill Assocs., 111 F.3d 269, 276 (2nd Cir. 1997) ("The 'good faith' component of the test under § 363(m) speaks to the equity of the bidder's conduct in the course of the sale proceedings."); In re Exennium, Inc., 715 F.2d 1401, 1404-05 (9th Cir. 1983) ("Lack of good faith is generally determined by fraudulent conduct during the sale proceedings."); In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978) ("The requirement that a purchaser act in good faith, of course, speaks to the integrity of his conduct in the course of the sale proceedings."); In re A.D. Mac Consulting Corp., 2008 WL 4186896 (Bankr. D.N.J. 2008).

Indeed, in A.D. Mac the purchaser was buying the estate's cause of action against it (the purchaser). There was no evidence of misconduct by the parties during an in-court auction and the sale price reflected the purchaser's motivation to "put an end to

%AO 72A
(Rev. 8/82)

litigation against it." Id. at *2. Similarly, in this case there is evidence to suggest that the purchaser has bid more for the assets, in part, to obtain a release of all claims by Dicon against it. While there was no auction *per se*, none of the other interested parties submitted a bid in any amount, much less a bid higher than the known amount offered by purchaser.

The evidence was uncontradicted that the Trustee, Mr. Whitaker, did not know the purchaser or its principals beforehand, that all negotiations were at arms-length, and that they were adversary in nature. Under these facts I find that the Trustee has established that the purchaser is purchasing the property in good faith in relation to the Dicon Chapter 11 estate.

I also find that the other elements for approval of the sale have been proven by the Trustee. With a debtor hopelessly insolvent and no prospects for reorganization, accruing debt it cannot service, and large professional fees and other administrative expenses accrued and mounting, there clearly is a "good business reason" to grant this Motion. In re Tidal Constr. Co., Case No. 08-42573, Dckt. No. 249 (Davis, J.) (September 28, 2009).

I also find that these growing costs justify an expedited sale of all of Dicon's operating assets despite the lack of procedural and substantive safeguards in the Chapter 11 plan process, since any significant delay will only insure the unsecured creditors walk away from this case empty handed. *See* In re Lionel Corp., 722 F.2d 1063 (2nd Cir. 1983).

AO 72A
(Rev. 8/82)

Indeed, the official creditor's committee has reached just that conclusion and supports the Motion after intimate involvement in the case from the outset.

While the marketing period and notice period were extremely short, the exigencies of this case left the Trustee with no reasonable alternative, he was able to identify a number of parties interested in purchasing these assets in a limited, specialized industry, and provided meaningful, substantive due diligence materials for them to formulate a bid. The fact that none were willing to overbid the contract under consideration here establishes that reasonable value is being received.

For all the foregoing reasons the sale will be approved by separate order.

_____
Lamar W. Davis, Jr.
United States Bankruptcy Judge

Dated at Savannah, Georgia

This 24th day of September, 2010.